UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAMES LOCKRIDGE,

        Plaintiff,

    v.                                        Case No. 21-cv-558-pp

CHARLES LARSON, CANDACE WHITMAN
and ROGER KRANTZ,

        Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26), DENYING PLAINTIFF'S FOURTH MOTION TO APPOINT COUNSEL (DKT. NO. 39) AND DISMISSING CASE**

---

Plaintiff James Lockridge, an incarcerated person who is representing himself, filed this lawsuit under 42 U.S.C. §1983. On December 2, 2022, the court received the defendants' motion for summary judgment. Dkt. No. 26. The plaintiff responded to the motion, but his response materials do not comply with the federal and local rules that the court previously directed him to follow when preparing his response. Dkt. No. 32. The court deems the defendants' proposed facts admitted, finds that the defendants are entitled to judgment as a matter of law on the plaintiff's federal claims and dismisses this case. The court relinquishes jurisdiction over the plaintiff's state law claims. The court also denies the plaintiff's fourth request to appoint counsel. Dkt. No. 39.

1

# I.    Facts

## A.    Procedural Background

On April 30, 2021, the court received the plaintiff's §1983 complaint against Fox Lake Correctional Institution Warden Randy Hepp, Dr. Charles Larson, Health Services Unit ("HSU") Manager Candance Whitman and Nurse Roger Krantz. Dkt. No. 1. On July 20, 2021, the court screened the complaint and allowed the plaintiff to proceed on Eighth Amendment claims of deliberate indifference and state law claims of negligence against Dr. Larson, Whitman and Krantz. Dkt. No. 7. The court dismissed Warden Hepp. Id. at 6–8.

On May 19, 2022, the court denied without prejudice the plaintiff's two motions for appointment of counsel. Dkt. No. 17. The court explained that the allegations in the complaint were "straightforward and easy to follow," and that the plaintiff had not presented evidence suggesting that he was unable to litigate his case effectively. Id. at 4–5. The court advised the plaintiff that he could refile his motion if he later determined that he still required the assistance of an attorney to litigate his lawsuit. Id. at 5–6. Also on May 19, 2022, the court issued a scheduling order setting deadlines for the parties to conduct discovery and file dispositive motions. Dkt. No. 18.

On August 19, 2022, the court denied without prejudice the plaintiff's motion to amend his complaint to add a fourth defendant that he believed had contributed to his injuries, because the plaintiff failed to follow the court's Local Rules for amending pleadings. Dkt. No. 23. The court advised the plaintiff that if he wanted to amend his complaint, he needed to attach a proposed

amended complaint and explain the specific changes he proposed in the amendment. Id. at 3. The plaintiff did not file a proposed amended complaint.

On December 2, 2022, the defendants moved for summary judgment. Dkt. No. 26. On December 5, 2022, the court issued an order directing the plaintiff to respond to the defendants' motion by the end of the day on January 3, 2023. Dkt. No. 32. The court explained the process the plaintiff needed to follow when filing his response. Id. at 2–3. The court advised him to "respond to each of the defendants' proposed findings of fact (Dkt. No. 29), either by agreeing with the proposed fact or explaining why he disagrees with the proposed fact." Id. at 1. The court explained that the plaintiff "must support every disagreement with a proposed fact by citing to evidence," which he could do either "by relying on documents that he attaches to his response or by telling the court his version of what happened in an affidavit or an unsworn declaration." Id. at 1–2. The court explained that "[a]n unsworn declaration is a way for a party to tell his side of the story while declaring to the court that everything in the declaration is true and correct." Id. at 2.

On December 19, 2022, the court received the plaintiff's request for an extension of his deadline to respond to the defendants' motion for summary judgment and for appointment of counsel. Dkt. No. 34. On January 11, 2023, the court denied the plaintiff's third request for counsel "for the same reasons it denied the earlier ones." Dkt. No. 35 at 2. But the court extended the plaintiff's deadline to respond to the defendants' motion for summary judgment from January 3 to February 17, 2023. Id. at 3–4. The court ordered the plaintiff

to "file his response and all supporting materials, as explained in the previous order," in time for the court to receive it by the end of that day. Id. at 3.

On February 16, 2023, the court received the plaintiff's response and supporting materials. Dkt. Nos. 36–37. The plaintiff responded to the defendants' proposed findings of fact in what he labels a declaration, which uses the following responses: "Agree," "Disagree," "Don't recall," "Can't say agree or disagree" or "not priviledged [*sic*]." Dkt. No. 37. He did not cite evidence in the record in support of any of his disagreements, and he did not file his own set of proposed facts or a declaration attesting to his version of the events. Because the plaintiff did not support disagreements with the defendants' proposed facts by citing to evidence—as the court had ordered him to—the court will deem the defendants' proposed facts admitted. See Civil Local Rule 56(b)(4) (E.D. Wis.); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission."). That means the court will consider the defendants' proposed facts to be undisputed so long as the defendants support them by citing evidence in the record. See Fed. R. Civ. P. 56(c)(1); Civil L.R. 56(b)(1)(C)(i) and (2)(B)(i)–(ii); Jenkins v. Syed, 781 F. App'x 543, 545 (7th Cir. 2019).

B.    Factual Background

The plaintiff was incarcerated at Fox Lake at all relevant times. Dkt. No. 29 at ¶1. Dr. Larson was employed by the Wisconsin Department of Corrections as a physician beginning in 2002, and he worked at Fox Lake from December 2006 until his retirement in August 2020. Id. at ¶2. Candace

Whitman is the Health Services Manager at Fox Lake. Id. at ¶3. Roger Krantz was a nurse at Fox Lake during all relevant times. Id. at ¶4.

The court allowed the plaintiff to proceed on claims against the defendants related to their treatment of his shoulder and back pain between February 20, 2019, when he fell and injured himself, and January 20, 2021, when he underwent shoulder surgery. Dkt. No. 7. The court found that for purposes of screening, the plaintiff's "allegations of significant and persistent pain satisfy the objective component of an Eighth Amendment claim." Id. at 6. The court concluded that the plaintiff's sparse allegations "that Krantz and Larson were aware of his injury and failed to provide him adequate medical treatment for his pain" were sufficient to allow him to proceed on an Eighth Amendment claim against them. Id. The court liberally construed the complaint to state an Eighth Amendment claim that Whitman was aware of the plaintiff's complaints about his medical care but failed to correct or remedy it. Id. at 7–8. The court exercised its supplemental jurisdiction over the plaintiff's related negligence claims against each of the defendants. Id. at 8 (citing 28 U.S.C. §1367(c)(3)).

1.   *The Defendants' Duties and Involvement*

As a physician at Fox Lake, Dr. Larson attended to incarcerated persons' medical needs, diagnosed and treated their illnesses and injuries and "arrang[ed] for professional consultation when warranted." Dkt. No. 30-8 at 26. He performed only "minor surgical procedures, e.g. suturing lacerations, debriding burns, incising and draining purulent infections, etc." Id. at 28. Dr.

5

Larson consulted with specialists and authorized "non-emergent off-site outpatient care with prior authorization when [the incarcerated person] [could] not be managed within the facility." Id. Dr. Larson explains that he "defer[red] to specialists and surgeons," including orthopedists, for specialized prisoner care. Dkt. No. 30-5 at ¶7. Dr. Larson retired in August 2020. Id. at ¶21; Dkt. No. 29 at ¶67.

Nurse Krantz was a Nurse Clinician 2 working under the direction of Whitman, the Nursing Supervisor. Dkt. No. 30-8 at 1–2. Krantz provided "skilled nursing care" to male incarcerated persons at Fox Lake, including patient assessment and treatment, assisting physicians with medical services, managing medications and maintaining medical records. Id. at 2. Nurses in the HSU, like Krantz, also triage and process incarcerated persons' treatment requests or requests for interviews or information. Dkt. No. 30-6 at ¶11. The nurse assigned to triage requests "may change every day." Id. Krantz does not recall responding to a specific request from the plaintiff between February 2019 and August 2020. Id. Krantz explains that he was not authorized to prescribe pain medications and instead had to defer to a provider, such as a physician. Id. at ¶9. He says he would have forwarded any of the plaintiff's complaints or requests about his medication to a provider. See, e.g., Dkt. No. 30-1 at 7; Dkt. No. 30-2 at 22.

As the Nursing Supervisor (also known as the Health Services Manager), Whitman is the Administrative Manager of the HSU and collaborates with the prison's physicians and dentists to provide care to incarcerated persons. Dkt.

No. 30-8 at 58. Whitman is not directly involved in patient care and was not involved in the plaintiff's treatment. Dkt. No. 30-7 at ¶5. She says her only involvement was with meetings of the Special Needs Committee and responding to requests for interviews or information directed to her. Id. She says she does not have the authority to order that any incarcerated person undergo an MRI or surgery; only advanced care providers can order those treatments. Id. at ¶¶6–10. She explains that once an MRI is ordered, "the scheduler will arrange that appointment with the community clinics." Id. at ¶7. She says she was not involved in the order for, or scheduling of, the plaintiff's MRI; a treating physician at Fox Lake ordered it, and the plaintiff received it during an offsite appointment at Waupun Memorial Hospital. Id. at ¶¶7–8. Whitman avers that she was not involved with scheduling the plaintiff's surgery on his right shoulder. Id. at ¶10. She reiterates that she does not have the authority to make treatment decisions, including ordering or discontinuing medications, assigning an incarcerated person to a particular care provider, handling pain management contracts or directing emergency care or emergency visits for incarcerated persons. Id. at ¶¶16, 19–21, 23.

2.    *The Plaintiff's Medical Care at Fox Lake*

From February 2019 through January 2021, the plaintiff received medical treatment at Fox Lake for several injuries and ailments, including chronic back pain, lumbar back pain with radiculopathy and right medial epicondylitis (commonly known as "tennis elbow"). Dkt. No. 30-1 at 13. On February 14, 2019, a registered nurse (who is not a defendant) saw the plaintiff

for complaints of low back pain. Id. at 7. The plaintiff reported his pain as "10/10 currently but report[ed] he [was] in a 'flare.'" Id. On February 20, 2019, security staff responded to a report from a nurse that the plaintiff fell from his bunk but landed on his feet. Id. at 4. The plaintiff said he was OK and "didn't complaint" about pain. Id. The nurse told the plaintiff to file a Health Services Request (HSR) if he were in pain, and nursing staff "would be happy to see him." Id. The plaintiff later informed security staff that his shoulder was hurting him. Id. Staff told him to submit an HSR about the issue, and the plaintiff "became upset and demanded to see [the Health Services Unit (HSU)]." Id. The plaintiff maintained that he was not in distress, and staff reiterated that he should file an HSR to see medical staff. Id. The plaintiff asserts, without evidence, that he hit his back on his dresser as he fell and injured his shoulder when he grabbed his bed to try and catch himself. Dkt. No. 37 at ¶11. About an hour later, security contacted the HSU to report that the plaintiff fell in the bathroom and was urinating blood. Dkt. No. 30-1 at 3. Nursing staff advised the plaintiff to drink water and notified second shift staff about his issues. Id. Nurse Krantz saw the plaintiff that evening, advised him to continue hydrating and scheduled a nurse sick call appointment for the next day. Id.

On February 21, 2019, Krantz again saw the plaintiff about his shoulder pain, back tightness and blood in his urine. Dkt. No. 30-1 at 5–7. Because Krantz is not authorized to prescribe pain medication, he referred the plaintiff for an appointment with Dr. Larson. Id. at 6–7. Dr. Larson ordered an ultrasound of the plaintiff's abdomen for his fall and the blood present in his

urine. Dkt. No. 29 at ¶15; Dkt. No. 30-1 at 8–9. The plaintiff received the ultrasound on February 26, 2019, and it confirmed the blood in his urine but found no abnormalities in his organs. Dkt. No. 30-1 at 34. Dr. Larson followed up on the ultrasound results and requested clarification from a technician. Id. at 12. Dr. Collins (who is not a defendant) later provided an addendum noting that the plaintiff's kidneys were of normal size and showed no issues. Id. at 14. On February 25, 2019, the plaintiff saw Dr. Larson for complaints of pain and tenderness in his right elbow that had returned after he received a cortisone injection in July 2018. Id. at 9–10. Dr. Larson ordered a repeat cortisone injection in the plaintiff's elbow and advised him to file an HSR for any other concerns. Id. These progress notes say nothing about the plaintiff's back or shoulder pain. Krantz says he consulted with Dr. Larson during one appointment with the plaintiff, and Dr. Larson "decided not to prescribe more narcotics due to diversion and addiction issues related to pain medication." Dkt. No. 30-6 at ¶8.

On April 2, 2019, Dr. Larson saw the plaintiff to evaluate his back pain and follow up on the cortisone injection and blood in his urine. Dkt. No. 30-1 at 13. The plaintiff reported his elbow was feeling better. Id. Dr. Larson noted that the plaintiff had an offsite follow up appointment with Dr. Choi about his chronic back pain later that month, and the plaintiff told Dr. Larson that he "wishe[d] to stay on the PT [physical therapy] waiting list" in the meantime. Id. at 14. Dr. Larson entered an order for physical therapy evaluation and treatment. Id. at 14, 19. These progress notes say nothing about the plaintiff's

shoulder or complaints of shoulder pain. On April 19, 2019, the plaintiff had his follow-up appointment with Dr. Choi, who performed a procedure to determine if the plaintiff was a candidate for radiofrequency treatment to address his lumbar back issues. Dkt. No. 30-1 at 21–22. Dr. Choi prescribed the plaintiff the muscle relaxer Tizanidine, and Dr. Larson entered an order for the medication the same day. Id. at 24. A non-defendant physical therapist treated the plaintiff six times between May 23 and June 27, 2019. Id. at 35–47.

Between April 30 and May 17, 2019, the plaintiff saw non-defendant medical staff for issues related to dental pain, chest pain and back pain. Dkt. No. 29 at ¶¶21–24. He received an EKG, which was normal, and was prescribed Tramadol for his dental pain. Id. On June 4, 2019, however, Dr. Larson followed up on that prescription, noting that Tramadol had an "interaction/intervention notice" with two other mediations the plaintiff was taking. Dkt. No. 30-1 at 30. Medical staff discontinued Tramadol because of those concerns. Id. at 31. During a May 17, 2019 appointment with an advanced practice nurse prescriber (who is not a defendant), the plaintiff asked about his back pain and his request for a medical mattress. Id. at 29. The nurse explained that Dr. Larson was addressing the plaintiff's back pain but advised him that it was rare for prisoners to be given specialized medical mattresses. Id.

On June 7, 2019, the plaintiff again saw Dr. Larson for his chronic back pain. Dkt. No. 29 at ¶27. This also was the first time he complained to Dr. Larson about pain in his shoulder, an inability to lift it fully and "grinding

sensations when he trys [*sic*] to raise it up." Dkt. No. 30-1 at 33. Dr. Larson examined the plaintiff, found no muscle weakness or signs of atrophy in his shoulder and no sign of impingement. Id. Dr. Larson discontinued the muscle relaxer because the plaintiff complained that it was not helping and referred the plaintiff for an x-ray and evaluation of his shoulder for suspected tendinitis. Id. at 50. He also scheduled the plaintiff for a follow-up with Dr. Choi for his back pain, and he ordered continued physical therapy and a consult with pain services. Id. A week later, on June 14, 2019, the plaintiff underwent an x-ray on his shoulder. Id. at 34. Dr. Collins reviewed the results and concluded that the plaintiff showed signs of mild degenerative joint disease but did not show signs of an injury such as a fracture, separation or dislocation. Id. Based on those results and his physical and functional examination of the plaintiff a week earlier, Dr. Larson "concluded that the need for an MRI was not supported." Dkt. No. 30-5 at ¶10.

On June 27, 2019, the plaintiff was taken to the emergency room for kidney stones. Dkt. No. 29 at ¶31. Dr. Larson prescribed hydrocodone for pain caused by the stones. Dkt. No. 30-2 at 6. On July 4, 2019, the plaintiff saw a nurse for complaints of mouth and back pain after he had three teeth removed and ran out of pain medication. Id. at 12. The plaintiff also mentioned that he had not been able to pass the kidney stones. Id. at 12–13. The nurse noted that the plaintiff's facial expressions and physical characteristics did not match his description of his condition and pain. Id. at 13. The nurse reported that the plaintiff was "[u]pset he is not going to ED or that [she was] not calling for

renewal of narcotics." Id. The plaintiff told her he would "complain again tomorrow as a doctor may be in or a dentist who can then 'order something better.'" Id. On July 12, 2019, Dr. Larson ordered another ultrasound to confirm that the plaintiff had passed his kidney stones; the plaintiff underwent the ultrasound four days later. Dkt. No. 30-1 at 49. On July 17, 2019, Dr. Larson prescribed the plaintiff Flomax to help with his kidney stones. Dkt. No. 30-2 at 5.

On July 23, 2019, HSU staff received a request from the plaintiff complaining that he had not yet received his x-ray results and asserting that "it seem[s] it has been forgotten about." Id. at 14. Medical staff responded the next day that the plaintiff had an appointment scheduled in August with Dr. Larson "to go over [his] test and treatment options." Id. That appointment occurred on August 16, 2019, during which Dr. Larson again referred the plaintiff to the pain clinic for his low back pain. Id. at 17. The plaintiff saw Dr. Choi the same day; Dr. Choi again recommended Tizanidine and suggested that a medical mattress could offer relief. Id. There is a handwritten note and a circle drawn around Dr. Choi's recommendation for Tizanidine; the note says, "Tried 4/22/19[;] DC'd 6/21/19 at patient request." Id. The note is signed with initials that are difficult to make out, but the last name appears to begin with "L." Id. On August 26, 2019, Dr. Larson emailed prison staff regarding Dr. Choi's suggestion that a medical mattress could be beneficial. Id. at 16. (Dr. Larson's note is signed with his initials "CEL," which could be the initials in the handwritten note on Dr. Choi's report. Id. at 17.) Staff informed

Dr. Larson that the Special Needs Committee had denied the plaintiff's request for a medical mattress "as most recently in June [*sic*]." Id. Staff suggested they could submit the request for a medical mattress with Dr. Choi's recommendation, but Whitman suggested they "reach out to Dr. Choi to validate whether this is a recommendation made solely by him or whether is was [*sic*] a recommendation by the patient during the visit before taking further consideration." Id. Dr. Larson agreed with that course of action. Id.

On August 27, 2019, the plaintiff saw Dr. Larson about pain and tenderness in his right arm, where the collarbone and shoulder blade meet. Dkt. No. 29 at ¶43. Dr. Larson administered a cortisone injection, but he noted that the plaintiff expressed having a "'needle' phobia and repeatedly tried to interfere with his injection." Dkt. No. 30-2 at 19. Dr. Larson reported that it "took some time to solicit [the plaintiff's] cooperation." Id. This is the last in-person appointment that the plaintiff had with Dr. Larson, but Dr. Larson continued to enter prescription orders and assist with the plaintiff's treatment before he retired in August 2020.

On September 9, 2019, the plaintiff saw nurse Nikki Shannon (not a defendant) and requested gabapentin for his pain. Dkt. No. 30-2 at 20. The plaintiff told Nurse Shannon he thought he was seeing "the provider" about his pain, which he reported at "a constant 10/10." Id. He insisted that "the dr." was going to provide him cream, but Shannon saw no note about a muscle cream. Id. The plaintiff reported that the injection he received in his right shoulder "took a majority of the pain away." Id. The nurse told the plaintiff she

would schedule him for a visit with a doctor to discuss his pain management, and the plaintiff was "agreeable" to that plan. Id. On September 26, 2019, the plaintiff again saw Nurse Shannon about his shoulder pain. Id. at 29. He reported limited movement in his shoulder, pain when he moved and difficulty sleeping. Id. at 29–30. Shannon told him she would request a "stronger muscle rub" from Dr. Larson, with whom the plaintiff had an upcoming appointment. Id. She also noted that the plaintiff had prescriptions for duloxetine and Tylenol. Id. The next day, Dr. Larson entered an order for capsaicin topical relief cream. Id. at 31–32.

On October 14, 2019, medical staff sent a letter to the plaintiff informing him that Dr. Larson authorized an orthopedic consult for the plaintiff because of his "continued complaints to nursing staff about [his] shoulder pain despite the injection [he] received 4 months ago." Id. at 34. The letter informed the plaintiff that staff would schedule the appointment when they had "a date and time from the orthopedist." Id. In the meantime, on October 25, 2019, the plaintiff saw Nurse Tammy Studzinski (not a defendant) about his shoulder and back pain, which he said was a ten out of ten. Id. at 35–36. The plaintiff said he could not open doors, dress or clean himself or raise his arm up to the side. Id. at 36. He declined Tylenol for pain, which he said "does not help at all." Id. He said he was using the capsaicin cream and a TENS unit, and he agreed to try taking acetaminophen. Id. A non-defendant doctor approved acetaminophen and ice for the plaintiff's pain. Id. at 36–37.

On November 17, 2019, the plaintiff saw a different nurse (not a defendant) for his continued shoulder pain. Id. at 39–40. He reported that "he will never get another injection," and the nurse opined that he was "fairly worked up" about his pain. Id. at 40. He insisted he needed "'pain meds'" and requested gabapentin. Id. The nurse reported that she "allowed [patient] to vent—he was aware that nursing has limited options and he has utilized those." Id. at 35. The nurse also reported that the plaintiff "seemed to focus on wanting a medication to work for the pain." Id.

On November 27, 2019, the plaintiff had his first appointment with Dr. Kron (not a defendant), though he originally was scheduled to see Dr. Larson. Id. at 41, 43. He discussed his concern about his right shoulder and low back pain, which he noted were not alleviated by the injections he recently had. Id. at 43. Dr. Kron did not have the plaintiff's full medical records, so he "set aside time to talk about" his pain in detail. Id. The doctor notes that he "spent a significant amount of time talking" with the plaintiff, so that he "could air his frustrations." Id.

On December 10, 2019, the plaintiff again saw Nurse Studzinski about his shoulder pain. Id. at 39. The plaintiff insisted "this is an ER matter" and complained that the capsaicin cream did not work on his shoulder. Id. The nurse instructed the plaintiff to take Tylenol and use an ice bag, and she noted that the plaintiff had an upcoming appointment with a provider. Id. On December 26, 2019, Dr. Kron extended the plaintiff's Tylenol prescription ahead of his upcoming appointment. Id. at 49–50. On January 21, 2020, the

plaintiff had that appointment with Dr. Kron, during which he again complained about his shoulder pain and that the injections he had received in his shoulder and back did not help. Dkt. No. 30-3 at 1. The plaintiff explained the history of his back issues, which began when he fell at the prison in February 2010. Id. The plaintiff insisted "that he needs a neurological medication like gabapentin." Id. Dr. Kron added a prescription for desipramine and diclofenac topical gel. Id. at 2. He noted that he wanted "to recheck an MRI" and scheduled a follow up for one month. Id.

On January 30, 2020, the plaintiff again saw Dr. Kron about his shoulder and low back pain. Id. at 3. The plaintiff was "pleased" about his back pain and reported walking without a cane and that "the meds are working a 7," which Dr. Kron took to mean they were 70% effective. Id. The plaintiff reported continued pain in his shoulder, from which his new medications had provided no relief. Id. The plaintiff explained that his shoulder problems began from his February 2019 fall from his top bunk. Id. Dr. Kron diagnosed the plaintiff with tendonitis in his right shoulder and ordered physical therapy and an MRI. Id. at 4. He also ordered a follow up after physical therapy and noted that if it "[was] not effective and/or [he] [found] something significant on the imaging study," he would refer the plaintiff for an orthopedic consultation. Id. Dr. Kron entered a prescription for naproxen for pain and additional physical therapy sessions, which the plaintiff had from March 10 to April 9, 2020. Id. at 5–7.

On February 3, 2020, the plaintiff underwent an MRI prescreen for his spine and shoulder. Dkt. No. 29 at ¶59. Ten days later, he saw a nurse for

throbbing pain in his shoulder. Id. at ¶60; Dkt. No. 30-1 at 2. The plaintiff said he expected to see Dr. Kron, not a nurse, and he wanted Dr. Kron to know that the desipramine he prescribed "worked for 4 days and . . . it was the best 4 days that he has had in years." Dkt. No. 30-1 at 2. He said he fell out of bed that morning but was only in pain and did not suffer another injury. Id. The nurse reminded him that he had referrals for imaging studies and physical therapy, and Dr. Kron would see him after he completed those. Id. at 2; Dkt. No. 30-2 at 45. The nurse noted that the plaintiff left the HSU walking at a fast pace with "minimal use of cane left hand, and swinging right arm." Dkt. No. 30-2 at 45.

Beginning in March 2020, outside medical care for incarcerated persons became limited because of restrictions related to the COVID-19 pandemic. Dkt. No. 29 at ¶64. The plaintiff still had appointments at the HSU, including one on March 2, 2020, for his complaints of a sore throat. Id. at ¶61. The treating nurse consulted Dr. Larson because of a contraindication with another of the plaintiff's medications. Id. Dr. Larson advised the nurse to prescribe the plaintiff Guaifenesin for his sore throat. Id.; Dkt. No. 30-2 at 46. On April 20, 2020, the plaintiff saw a nurse for his back and shoulder pain. Dkt. No. 30-3 at 23. He requested a lower bunk restriction, an extra pillow and a TENS unit. Id. The nurse renewed his lower bunk and cane restrictions, which had expired, and forwarded his request for a TENS unit to his physical therapist. Id. at 25. The plaintiff was upset "because he feels that nothing is getting done," but the nurse explained that there was not much they could do until the clinics

reopened and could perform the scheduled MRI on the plaintiff's shoulder and back. Id. On June 15, 2020, Nurse Krantz documented that the plaintiff reiterated that he wanted the MRI performed once the COVID restrictions had been lifted and that he was not refusing an MRI. Id. at 54.

On July 3, 2020, the plaintiff saw Dr. Kron about his back and shoulder pain. Dkt. No. 29 at ¶65. The plaintiff noted that the topical diclofenac did not work but said he would continue using the capsaicin muscle rub. Dkt. No. 30-3 at 52. Dr. Kron extended the plaintiff's use of the TENS unit and issued him new parts for the unit. Id. at 34. He also increased the plaintiff's pain medication. Id. at 52. He noted that the MRI of the plaintiff's shoulder was pending and that he would follow up for care based on the results of that imaging and the orthopedist's opinion. Id. On July 30, 2020, Nurse Krantz saw the plaintiff after he returned from an offsite visit to the emergency room at Waupun Memorial Health, where he was treated for a kidney stone. Dkt. No. 29 at ¶66; Dkt. No. 30-2 at 21–22. The plaintiff reported having adequate pain control at that time. Dkt. No. 30-2 at 22.

On August 18, 2020, the plaintiff had an appointment at the HSU with a non-defendant nurse for a Special Needs Evaluation. Id. at 25. He requested a lower bunk restriction, an extra pillow and the return of a cane he previously had but that had been discontinued. Id. The nurse completed the evaluation forms and noted that the plaintiff was able to walk upright without hunching "and at a quick pace" without the cane or other aids. Id. On August 21, 2020, the plaintiff again saw Dr. Kron for a follow up about his pain pending the MRI.

Dkt. No. 30-3 at 28. Dr. Kron's assessment remained unchanged pending the imaging and orthopedic consultation. Id. at 28–29. He noted that the plaintiff was "very dramatic, histrionic throughout the exam." Id. at 28. He again increased the plaintiff's pain medication. Id. at 29.

On September 9, 2020, the plaintiff underwent an MRI on his right shoulder. Dkt. No. 30-2 at 23. The MRI showed tendinosis in the supraspinatus and infraspinatus muscles in the plaintiff's rotator cuff and an 8mm by 16mm tear in his supraspinatus, but it showed no muscle atrophy or edema. Id. On September 22, 2020, the plaintiff saw orthopedist Dr. Eric Nelson via telemedicine for a consultation. Id. at 26. Dr. Nelson reviewed the results of the MRI, noting the tear but documenting lack of muscle atrophy or deformity. Id. He recommended the plaintiff undergo rotator cuff repair surgery, and the plaintiff consented to that treatment. Id. at 27. Dr. Nelson also noted that the plaintiff spent "the majority of the conversation today attempting to steer the discussion in the direction about his being disgruntled about the time frame involved in obtaining the MRI" and that he told Dr. Nelson "that he is pursuing litigation." Id. at 26. Dr. Nelson "made it clear" that he did not, and would not, agree to be an expert witness to testify about the plaintiff or "about medical decisions made in the past by other people." Id.

On October 8, 2020, the plaintiff saw Dr. Kron for a follow-up from his MRI and ortho consult. Dkt. No. 30-1 at 4. Dr. Kron noted that the plaintiff was using a TENS unit and taking Tylenol, naproxen, desipramine and duloxetine for his pain, but he said that he was still "hurting a lot" and had occasionally

severe pain that radiated into his left buttock and leg. Id. Dr. Kron ordered the plaintiff gabapentin, which the director of the prison approved on October 16, 2020. Dkt. No. 30-3 at 33, 35. On November 16, 2020, Dr. Kron confirmed in a note to a nurse that he had prescribed the plaintiff gabapentin. Id. at 33.

On December 16, 2020, the HSU received an HSR from the plaintiff stating that the gabapentin was not helping, and the pain in his shoulders and back had increased since he tested positive for COVID-19 a month earlier. Id. at 32. A nurse forwarded the plaintiff's request to Dr. Kron, who responded that the plaintiff was "already on a fair amount of pain medication." Id. He recommended that the HSU schedule the plaintiff for an appointment with him or another provider to "evaluate his worsening pain and better manage him." Id. On December 22, 2020, the plaintiff saw Dr. Laura Sukowaty (not a defendant) for a follow-up about his pain and the gabapentin not working. Id. at 35, 37. The plaintiff said he was not taking his naproxen or Tylenol, and the TENS unit was helping only "minimally." Id. at 37. Dr. Sukowaty approved the plaintiff's request to increase his gabapentin prescription. Id. at 35.

On January 12, 2021, medical staff ordered an EKG for the plaintiff. Id. at 38. Six days later, Dr. Palop Rey (not a defendant) performed a preoperative examination on the plaintiff ahead of scheduled surgery on his right shoulder rotator cuff tear. Id. at 39. Dr. Rey noted that the plaintiff "looks forward to finally getting this shoulder repaired." Id. at 41. On January 20, 2021, Dr. Nelson performed the surgery on the plaintiff's right shoulder. Id. at 42. The surgery revealed "rather abundant bursitis" in the plaintiff's shoulder,

which Dr. Nelson debrided to reveal the rotator cuff tear. Id. Dr. Nelson repaired the tear and closed the incision. Id. at 42–43. He instructed the plaintiff to use a sling at his discretion and that he could remove the dressings on his wound within five days. Id. at 43. He instructed him to follow physical therapy once he was back at the prison, and that he would follow up in about eight weeks through telemedicine. Id. Once back at the prison, the plaintiff resumed physical therapy once or twice a week for twelve to eighteen visits. Id. at 46.

The plaintiff continued receiving treatment at the prison for his back pain throughout 2021. Id. at 37, 45, 48. He was provided gabapentin, duloxetine and prazosin for his pain. Id. at 45. Nurse Krantz saw the plaintiff on May 21, 2021, when he returned from an offsite neurological consultation. Id. at 49–50. But the defendants did not again treat the plaintiff for back or shoulder pain.

### 3.    *The Plaintiff's Special Needs Requests*

During the relevant period, the plaintiff requested a lower bunk restriction and a medical mattress. The earliest evidence in the record of the plaintiff's request for a lower bunk is in a nursing note from his February 14, 2019 sick call visit with a non-defendant nurse. Dkt. No. 30-1 at 7. That nurse noted that the plaintiff was "requesting low bunk-review of his back pain complaints." Id. The same day, the plaintiff filed a request for information about being moved to a top bunk. Dkt. No. 30-9 at 15. A nurse responded that his request "was forwarded to the Special Needs Committee," and a provider

was notified to follow up in four months. Id. A week later, on February 21, 2019, the plaintiff requested a lower bunk in an HSR. Id. at 83. A nurse triaged that request and directed his request to the Special Needs Committee. Id. On February 22, 2019 (after the plaintiff had fallen from his top bunk and injured himself), the Special Needs Committee met to decide prisoners' requests for various accommodations. Dkt. No. 30-8 at 67. The Committee voted to approve the plaintiff's request for a lower bunk for one year in response to an HSR he had filed on February 1, 2019. Id. at 68.

On April 20, 2020, a non-defendant nurse extended the plaintiff's expired lower bunk restriction for two months "or until Special Needs Committee can meet and make a decision." Dkt. No. 30-3 at 20. The plaintiff had an August 18, 2020 Special Needs evaluation for a lower bunk with another non-defendant nurse. Dkt. No. 30-2 at 25. That nurse completed the evaluation forms with the plaintiff and forwarded them to the Special Needs Committee. Id. There is no evidence in the record showing the results of the Committee's meeting and whether it again approved the plaintiff's request for a lower bunk.

The first mention of the plaintiff's requests for a medical mattress is in a progress note from a May 17, 2019 appointment with an advanced practice nurse prescriber, during which the plaintiff asked about his request for a medical mattress. Dkt. No. 30-1 at 29. The nurse prescriber explained "that rarely specialized mattresses are given except for extreme chronic illness." Id. She noted that the plaintiff became "angry with this statement and walk[ed] out of the clinic." Id. A week later, during a May 23, 2019 physical therapy

appointment, the plaintiff insisted that his physical therapist "had access or ability to authorize or persuade special needs in terms of changing his mattress." Id. at 47. The physical therapist informed the plaintiff that only the Special Needs Committee could accommodate that request. Id. The HSU received a request from the plaintiff on May 28, 2019 for a medical mattress. Dkt. No. 30-9 at 77. A nurse referred the request to the Special Needs Committee the next day. Id. The plaintiff again brought up the mattress during his June 20, 2019 physical therapy appointment. Dkt. No. 30-1 at 40. He also "petition[ed]" Dr. Larson for a medical mattress during an appointment on June 27, 2019. Dkt. No. 30-8 at 44.

As discussed above, Dr. Choi brought up the possibility of a medical mattress in his report following an August 2019 appointment with the plaintiff. Dkt. No. 30-2 at 17. Dr. Larson forwarded that request to Whitman and other prison staff. Id. at 16. Prison staff noted that in June 2019 the Special Needs Committee had denied the plaintiff's last request for a medical mattress. Id. Whitman suggested medical staff confirm that the doctor—and not the plaintiff—had brought up that treatment option and asked a nurse to "touch base with the clinic and let [them] know." Id. There is no further evidence in the record showing whether medical staff followed up with Dr. Choi's office. Nor is there any evidence showing that the plaintiff ever received a medical mattress.

## II.     Discussion

### A.     Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

### B.     Eighth Amendment

As previously explained, the court reviews the plaintiff's claims of inadequate medical treatment under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations

omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To proceed on this Eighth Amendment claim, the plaintiff must present evidence showing both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

An objectively serious medical condition is one "that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). The plaintiff's medical need does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010).

"[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). An incarcerated person's "dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to show the doctor was deliberately indifferent to a serious medical need. Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)) (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may medical officials "doggedly persist[] in a course of treatment known to be ineffective."

Greeno, 414 F.3d at 655. In short, the evidence must show that the plaintiff received treatment that was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." Id. at 654 (quoting Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)).

C.    Analysis

The court allowed the plaintiff to proceed on claims that Dr. Larson and Nurse Krantz provided inadequate treatment for his shoulder and back pain for nearly two years, from his fall in February 2019 until his shoulder surgery in January 2021. The court also allowed him to proceed on a claim that although he repeatedly contacted HSU Manager Whitman about his substandard medical care, she took no corrective action. The court noted that the plaintiff's "allegations of significant and persistent pain satisfy the objective component of an Eighth Amendment claim." Dkt. No. 7 at 6 (citing Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002)). The defendants do not contest that determination, so the court will assume for purposes of this decision that the plaintiff has satisfied the objective component. The question is whether there is evidence from which a jury could determine that the defendants were aware of but deliberately indifferent to the plaintiff's serious medical need.

In the screening order, the court noted that the complaint lacked detail about these claims, but it found that the plaintiff had alleged enough to state a claim under the liberal pleading standard the court must apply at the screening stage. The court does not apply the same liberal pleading standard when deciding the defendants' motion for summary judgment. The court views

the facts in the light most favorable to the plaintiff, but he still must present evidence that would allow a jury to rule in his favor. See Van Diest Supply Co. v. Shelby Cty. State Bank, 425 F.3d 437, 439 (7th Cir. 2005); see also Hoeft v. Kasten, 691 F. Supp. 2d 927, 931 (W.D. Wis.), aff'd, 393 F. App'x 394 (7th Cir. 2010) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)) ("Although plaintiff provided sufficient *allegations* in his complaint to state an Eighth Amendment . . . claim, he has failed to produce sufficient *evidence* to defeat defendant's summary judgment motion on that claim."). The plaintiff has not presented sufficient evidence, and the undisputed facts do not support the claims in his complaint.

1. *Dr. Larson*

There is no evidence that Dr. Larson was deliberately indifferent to the plaintiff's shoulder and back pain. Dr. Larson saw the plaintiff five times for treatment from February 20, 2019 through his retirement in August 2020. During those appointments, Dr. Larson ordered an x-ray of the plaintiff's shoulder to determine whether there were any injuries from the plaintiff's fall. When the results of the x-ray showed none, Larson ordered a steroid injection into the plaintiff's shoulder for pain because that had benefitted the plaintiff previously in treating his elbow injury. The plaintiff later told a nurse that the shoulder injection "took a majority of the pain away." Dkt. No. 30-2 at 20. Dr. Larson also ordered a muscle rub cream for the plaintiff's pain, referred him for physical therapy and varied his medication types and dosages. When those efforts did not resolve the plaintiff's pain, Larson referred the plaintiff for

an orthopedic consultation. Even when Dr. Larson was not personally examining the plaintiff for his complaints, he consulted with other non-defendant medical staff to discuss treatment of the plaintiff's medical issues, including ailments unrelated to this lawsuit (kidney stones, elbow pain, sore throat and the plaintiff's desire for a medical mattress). Dr. Larson also intervened when another provider prescribed medication that was contraindicated by the plaintiff's other prescriptions.

The undisputed evidence shows that Dr. Larson was attentive, involved and flexible in his treatment approaches to the plaintiff's pain. When one course of action did not provide the plaintiff relief, Dr. Larson tried other approaches. Contrary to the complaint's assertions, the evidence shows that Dr. Larson did not "doggedly persist[] in a course of treatment known to be ineffective." Greeno, 414 F.3d at 655. The evidence also shows that Dr. Larson not only was careful and professional when he saw the plaintiff, but that he remained involved in care that he did not directly provide to make sure the plaintiff would not face adverse reactions from other prescriptions or treatment plans. These decisions show that Dr. Larson exercised his medical judgment and based his decisions on the plaintiff's progress and response to treatment. That is not deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

The complaint asserts that the plaintiff received "immediate" shoulder surgery after an MRI revealed his need for surgical intervention. Dkt. No. 1 at 2. The plaintiff claims that Dr. Larson's refusal or failure to order an MRI earlier caused him "countless nights of no sleep, bathing[,] depression, not eating & defending myself from letting other inmates beat me up." Id. at 2–3. The evidence shows that Dr. Larson ordered an x-ray of the plaintiff's shoulder on June 7, 2019, which was the first time the plaintiff told Dr. Larson about his shoulder pain. Another doctor performed the x-ray a week later, and the results suggested the plaintiff had mild degenerative joint disease but did not show that the plaintiff had an injury such as a fracture, separation or dislocation. Dr. Larson did not order an MRI because the need for one was not medically supported. Instead, he ordered non-surgical treatment to address the issues that the x-ray showed. It was not until six months later, in January 2020, that Dr. Kron ordered an MRI on the plaintiff's shoulder. The plaintiff underwent the MRI in September 2020, and it revealed a tear in the plaintiff's supraspinatus muscle.

This evidence does not show that Dr. Larson was deliberately indifferent by declining to order the MRI earlier. It shows a conservative treatment approach for the plaintiff's shoulder based on Dr. Larson's physical, in-person assessment of the plaintiff's shoulder and the imaging results he had at the time. The plaintiff told nursing staff that those non-surgical measures had substantially relieved his pain. It is possible that, in time, Dr. Larson also would have ordered the MRI after the conservative treatment options stopped

providing relief. But Dr. Larson stopped treating the plaintiff's shoulder injury in August 2019, only two months after the x-ray and cortisone injection. This evidence might suggest that Drs. Larson and Kron may have disagreed about the proper treatment approach for the plaintiff's shoulder pain. But mere "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Pyles, 771 F.3d at 409 (citing Johnson, 433 F.3d at 1013). The plaintiff presents no evidence suggesting that Dr. Larson's decision not to order the MRI earlier, after the x-ray showed no structural damages, was unreasonable or that it contributed to the worsening of the plaintiff's shoulder pain or injury.

At most, the evidence shows that the plaintiff was dissatisfied with the course of action and treatment that Dr. Larson followed. But the Eighth Amendment does not give an incarcerated person the right to demand certain medications or direct his own medical treatment. See Burton v. Downey, 805 F.3d 776, 785 (7th Cir. 2015). That Dr. Larson did not provide the plaintiff "the particular long-term treatment that he desired" does not mean he was deliberately indifferent to the plaintiff's medical needs. Anderson v. Schroeder, No. 16-cv-1543, 2018 WL 3130644, at *5 (E.D. Wis. June 26, 2018) (citing Thomas v. Wahl, 590 F. App'x 621, 624 (7th Cir. 2014)).

2.    *Nurse Krantz*

The undisputed evidence shows that Krantz saw the plaintiff only three times for treatment during the relevant period and only once about his

shoulder or back pain. He first saw the plaintiff on the evening of February 20, 2019, after the plaintiff fell off his top bunk. But the only issue addressed was blood in the plaintiff's urine. Krantz advised the plaintiff to hydrate and scheduled a nurse sick call appointment for the next day. He saw the plaintiff the next day to discuss the plaintiff's back tightness and shoulder pain. Because Krantz cannot prescribe pain medication, he referred the plaintiff for an appointment with Dr. Larson about medication. Krantz also noted that the plaintiff was "on schedule for special needs tomorrow," which related to his request for a lower bunk. Dkt. No. 30-1 at 7. Krantz saw the plaintiff only once more during the relevant period, on July 30, 2020, after the plaintiff returned from an offsite visit for treatment of a kidney stone. The plaintiff reported having adequate pain control at that time. This examination did not involve complaints about the plaintiff's shoulder or back pain. Krantz also saw the plaintiff after the relevant period, on May 21, 2021, when he returned from an offsite neurological consultation. Again, this examination did not involve the plaintiff's complaints of back or shoulder pain.

The undisputed evidence does not support a finding that Krantz was deliberately indifferent to the plaintiff's complaints of shoulder or back pain. Krantz saw the plaintiff about his shoulder or back pain only once. As a nurse clinician, he was not able to prescribe or adjust the plaintiff's pain medication. Krantz instead did what he could as a nurse clinician by consulting with an advanced care provider (Dr. Larson) who *could* change or increase the plaintiff's medication. Krantz recalls discussing the plaintiff's pain medication with

Dr. Larson on one occasion, and Dr. Larson had concerns about overprescribing medication based on the plaintiff's history of addiction issues and diverting his medication. The Seventh Circuit has held that, "[a]s a matter of professional conduct, nurses may defer to instructions given by physicians unless 'it is apparent that the physician's order will likely harm the patient.'" Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) (quoting Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010)). A nurse may be found deliberately indifferent to a risk of harm in following an advanced care provider's orders only if the risk to the plaintiff's health was "obvious." Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 683 (7th Cir. 2012).

The evidence does not suggest that Krantz ignored an obvious or apparent risk to the plaintiff's health by deferring to Dr. Larson's concerns about the plaintiff abusing his medication. It instead suggests that he worked with Dr. Larson to treat the plaintiff's pain without triggering his history of medication abuse. That decision reflects an exercise of medical judgment, not deliberate indifference to the plaintiff's pain. See Thomas, 590 F. App'x at 624 (affirming summary judgment for medical staff who switched prisoner's medication from Vicodin "to a less efficacious nonnarcotic" because of prisoner's history of substance abuse "and the potential for misuse of controlled substances in prisons").

3.    *HSU Manager Whitman*

The court explained in the screening order that prison supervisors "'are responsible for what they do themselves, not for what their subordinates do.'

To be held liable for the actions of a subordinate under §1983, a supervisor 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" Dkt. No. 7 at 7 (quoting Day v. Subsecretario del Sistema Penitenciario Federal, 838 F. App'x 192, 193 (7th Cir. 2021); and Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001)). To proceed on his claim against Whitman, the plaintiff needed to present evidence showing that Whitman either was personally responsible for the plaintiff's inadequate care or that she knew about his inadequate care yet facilitated, approved, condoned or ignored it. Id.

It is undisputed that in her administrative role, Whitman does not provide direct medical or psychological treatment for prisoners. Nor does she order referrals for prisoners to offsite appointments (such as imaging studies or surgery), schedule offsite appointments or order or discontinue medications. She defers to advanced care providers, such as Dr. Larson, for the evaluation and treatment of prisoners. There is no evidence that Whitman was ever made personally aware of a treatment decision that posed an apparent risk to the plaintiff's health or safety and that she disregarded that risk. See Holloway, 700 F.3d at 1075; Berry, 604 F.3d at 443.

It also is undisputed that Whitman had almost no involvement in the plaintiff's healthcare or treatment. Whitman was a member of the Special Needs Committee, which reviewed the plaintiff's requests for a lower bunk and a medical mattress. The committee met on February 22, 2019 (after the plaintiff had fallen from his top bunk) to decide prisoners' requests for various

33

accommodations. Whitman was present at that meeting. Dkt. No. 30-8 at 67. Although the minutes of the meeting do not specify how any specific member voted, the committee approved the plaintiff's request for a lower bunk for one year. Whitman cannot be considered deliberately indifferent for being a part of the committee that gave the plaintiff what he asked for. It is unfortunate that the committee met and approved the plaintiff's request only after he had fallen from the top bunk and hurt himself. But there is no evidence that Whitman was personally aware of and disregarded a risk to the plaintiff's health or safety by him having a top bunk for a few weeks between when he filed his request for a lower bunk and when the committee approved it.

Whitman also was responsible for responding to requests for treatment or for interviews and information that were directed to her. But the plaintiff does not present any evidence of requests about the treatment of his shoulder or back pain that Whitman was aware of but disregarded. The plaintiff directed several HSRs and requests for information to Whitman, but Kranz explained that the triaging nurse changes every day. Dkt. No. 30-6 at ¶11. That means Whitman was not always the person who received, triaged or responded to requests. For example, on June 18, 2019, the plaintiff wrote to "Mrs Candy" requesting a review of his medical file. Dkt. No. 30-9 at 9–10. A non-defendant nurse forwarded his request, but it does not specify to whom she forwarded it. Id. at 9. On October 23, 2019, the HSU received a request from the plaintiff directed to Whitman that says it is his "second time writing you" about his shoulder pain. Id. at 7. A non-defendant nurse responded the next day that the

plaintiff was scheduled for a sick call visit. Id. On November 19, 2019, the HSU received a request for information from the plaintiff directed to Whitman alleging that he had written to her "over and over" about his back and shoulder pain, but that he had received no response. Id. at 5. A non-defendant nurse responded that the plaintiff had an upcoming appointment with Dr. Larson and advised him to "[c]ontinue treatment as directed." Id. Whitman responded to a March 3, 2020 request for information in which the plaintiff alleged that someone had lied about him selling his medication. Id. at 1. Whitman wrote that the HSU takes "allegations of misuse of medication seriously," and she told the plaintiff that he could request a change in his medication. Id. The plaintiff again complained about his medications in an April 23, 2020 HSR directed to Whitman. Id. at 31. A nurse responded and told the plaintiff to discuss his medications with his provider. Id. Even though Whitman was not always the person who responded to the plaintiff's requests for information, someone from the HSU always responded to him and usually within a day. HSU staff scheduled the plaintiff for nurse visits or referred him to his next appointment with a provider for his larger concerns. There is no evidence that Whitman personally was aware of any of the plaintiff's requests to which she did not respond, nor is there evidence that she disregarded his concerns or directed HSU staff to disregard them.

There is no evidence that Whitman could have done more to address the plaintiff's concerns. Nor is there evidence she *should* have done anything more because the plaintiff's medical records showed that he was receiving frequent

and adequate care from Dr. Larson, nursing staff and offsite providers. Because Whitman had no reason to believe the plaintiff's treatment posed a serious risk to his health, no reasonable jury could conclude that she was deliberately indifferent by deferring to Dr. Larson and the HSU's course of treatment.

4.    *Conclusions of Law*

Incarcerated persons are "not entitled to demand specific care" and are "not entitled to the best care possible. [They are] entitled to reasonable measures to meet a substantial risk of serious harm." <u>Forbes v Edgar</u>, 112 F.3d 262, 267 (7th Cir. 1997). On this record, no reasonable jury could conclude that Dr. Larson disregarded the plaintiff's pain or failed to provide adequate treatment for his complaints. Dr. Larson may not have provided the specific treatment that the plaintiff wanted, but that does not mean he was deliberately indifferent. Nurse Kranz saw the plaintiff only once for his complaints of shoulder and back pain, and he reasonably deferred to Dr. Larson's treatment plan and medication decisions. HSU Manager Whitman did not treat the plaintiff directly, and she was a member of the Special Needs Committee that approved his request for a lower bunk. Because the evidence does not show that Dr. Larson or the HSU provided inadequate treatment, there was no risk of which Whitman could have been aware yet disregarded. Nor is there evidence that Whitman was aware of and disregarded the plaintiff's

requests or his complaints about pain or that she acted unreasonably in response to them. The defendants are entitled to judgment as a matter of law.[1]

Having granted judgment for the defendants on the plaintiff's federal claims, the court will relinquish jurisdiction over his state law claim of negligence and dismiss that claim without prejudice. See Boyd v. Bellin, 835 F. App'x 886, 889 (7th Cir. 2021); 28 U.S.C. §1367(c)(3). The plaintiff is free to pursue that claim in state court.

### III    Plaintiff's Response to the Defendants' Reply Brief and Fourth Motion to Appoint Counsel (Dkt. No. 39)

On March 17, 2023, over two weeks after the defendants filed their reply brief in support of their motion for summary judgment, the court received from the plaintiff a "response" to the defendants' reply that includes a fourth motion to appoint counsel. Dkt. No. 39. The plaintiff says that the defendants' reply states "that a number of things was [*sic*] not done correct." Id. at 1. He does not specify what those "things" are. The plaintiff asserts that he has "been asking for counsel since [his] case started," and his family sent "someone a very small amount of money to help." Id. He says that "makes it obvious [that neither he] nor [his] help didn't know what [they] were doing." Id. The plaintiff says he

---

[1] Because it has found that the defendants are entitled to summary judgment on the merits of the plaintiff's claims, the court need not address the defendants' assertion that they are entitled to qualified immunity. See Sierra-Lopez v. County, No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

"don't have a grasp of this, which was stated in a p[re]vious denial of counsel."
Id. at 2. He asks that he "be given assistance for someone who is qualified." Id.

The plaintiff's pleading is a sur-reply to the defendants' reply brief.
Neither the Federal Rules of Civil Procedure nor this court's Civil Local Rules
allow parties to file sur-replies, and the plaintiff did not seek permission from
the court to file it. "'The decision to permit the filing of a surreply is purely
discretionary and should generally be allowed only for valid reasons, such as
when the movant raises new arguments in a reply brief.'" Watt v. Brown
County, 210 F. Supp. 3d 1078, 1082 (E.D. Wis. 2016) (quoting Meraz-Camacho
v. United States, 417 F. App'x 558, 559 (7th Cir. 2011)). The defendants did not
raise new arguments in their reply brief; they responded to the plaintiff's brief
in opposition and asserted that the plaintiff failed to propose additional facts
warranting denial of their motion for summary judgment. The plaintiff's sur-
reply takes issue with that position; it does not assert that the defendants
raised new arguments. The court has not considered the plaintiff's sur-reply in
reaching its decision to grant the defendants' motion for summary judgment.

The court also will deny the plaintiff's request for counsel for the same
reasons it explained in denying his three previous requests for counsel. The
plaintiff may be correct that counsel could have done a better job responding to
the defendants' motion for summary judgment. But the court previously
explained that the plaintiff's filings showed he understood the important
factual and legal issues of his case and could litigate this case adequately on
his own. Dkt. No. 17 at 4–5. The court described for the plaintiff how to

respond to the defendants' proposed findings of fact and their brief in support of their motion, and it granted his request for additional time to respond. Dkt. Nos. 32, 35. The plaintiff did not follow the court's instructions and filed an incomplete response with almost no evidentiary support. His failure to follow the court's instructions is not reason to grant his motion, recruit him counsel and allow counsel to file amended responses to the defendants' motion and facts.

The court reiterates that the allegations in the plaintiff's complaint were very thin, and the evidence in support of granting the defendants' motion for summary judgment is substantial. The Seventh Circuit has instructed courts to "'be careful stewards of the limited resource of volunteer lawyers'— particularly in districts where the demand for pro bono services far outpaces the supply of law firms or solo practitioners with 'the resources to deploy aid.'" Watts v. Kidman, 42 F.4th 755, 764 (7th Cir. 2022) (quoting Eagan v. Dempsey, 987 F.3d 667, 700 (7th Cir. 2021) (Easterbrook, J., dissenting in part) (cleaned up)). That means the court must consider "the perceived merits of—or likelihood of success on—an indigent plaintiff's claims in its decision whether to allocate scarce pro bono counsel resources to the case before it." Id.

The court allowed the complaint to proceed beyond screening, but the threshold for making it past the screening stage is very low. "[E]ven where a litigant's claim is nonfrivolous and factually and legally plausible such that it survives § 1915(e)(2) screening, the recruitment of counsel is unwarranted if the plaintiff's 'chances of success are extremely slim.'" Id. at 766 (citing Cole v.

<u>Janssen Pharms., Inc.</u>, 265 F. Supp. 3d 892, 898 (E.D. Wis. 2017)). The combination of the plaintiff's weak allegations and the defendants' strong evidence shows that even if the court were to recruit counsel, the plaintiff's chances of success on his claims were very low. The court concludes that recruiting the plaintiff counsel, especially at this late stage of the litigation, is not warranted.

## IV. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 26. The court **DISMISSES WITHOUT PREJUDICE** the plaintiff's state law negligence claims.

The court **DENIES** the plaintiff's fourth motion to appoint counsel. Dkt. No. 39.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. <u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief

from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of June, 2023.

BY THE COURT:

**HON. PAMELA PEPPER**
**United States District Judge**